UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| IN RE YASMIN AND YAZ (DROSPIRENONE) MARKETING, SALES PRACTICES AND PRODUCTS LIABILITY LITIGATION | ) ) ) ) ) ) ) | 3:09-md-02100-DRH-PMF<br><br>MDL No. 2100 |

**This Document Relates to:**

**ALL CASES**

_____

AMENDED
CASE MANAGEMENT ORDER NO. 24
BELLWETHER TRIAL SELECTION PLAN


I.      INTRODUCTION


1.     The process of establishing a bellwether plan began with discussions at monthly conferences. At the same time, a number of meetings occurred between the parties in an effort to resolve all their differences on the issues at bar. At the last conference, it was reported that the meet and confer efforts had been exhausted for the most part. The Court directed each side to submit detailed proposals simultaneously and to reply simultaneously. The parties, however, agreed to meet and confer in a last attempt to agree. The dispute is now at issue and the Court, with very detailed submissions from each side of the issue before it as well as the arguments made by each side at the last conference embedded in its

memory, enters this order. The Court considered the submissions, including the exhibits attached thereto, and arguments of the parties, District Judge Fallon's article regarding his experience in Vioxx and Propulsid (**Eldon E. Fallon, Jeremy T. Grabill & Robert Pitard Wynne, Bellwether Trials in Multidistrict Litigation, 82 TUL. L. REV. 2323 (2008)**), and a number of orders of other district judges handling MDL cases who have considered the same issue. The Court finds that this litigation will benefit substantially from the establishment of bellwether trials. Currently, there are well in excess of 3700 filed cases in this district and the number grows by leaps and bounds every month. <u>This amended order follows the October monthly status conference, at which the PSC aired a number of issues which it takes with the original order. Despite contradicting much of what it originally advocated, the predominate effect of the Plaintiffs' position is that they want the trial schedule pushed back four months. In keeping with the aggressive schedule and demeanor all agreed upon when this MDL was established, while keeping fairness and a just adjudication of the issues at the fore, the Court believes it has arrived at a fair adjustment to its previously established plan in order to alleviate Plaintiffs' concerns yet achieve the goals established early on.</u> [1]

2. The order now entered governs the selection of Plaintiffs for discovery and trial as part of a bellwether trial plan for cases currently pending in

---

[1] Throughout this amended order the Court will employ the unusual device of underlining new language and striking through language that is to be removed, in order to make it easier for all to quickly see the difference between the old and new orders.

MDL No. 2100 involving Plaintiffs who allegedly suffered personal injury from taking YAZ®, Yasmin® and/or Ocella®.  It is critical to a successful bellwether plan that an honest representative sampling of cases be achieved.  Each side of this litigation, through its representative leadership, has expressed, in some form, a willingness to waive all objections to venue, including the issues involved in ***Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach,* 523 U.S. 26, 28, 118 S.Ct. 956, 140 L.Ed.2d 62 (1998**),  The Court finds such a waiver to be critical to the success of this endeavor.  However, the Court also finds that such a waiver must be completely voluntary, just as the holding of bellwether trials is within the discretion of the transferee judge.  Therefore, if any Plaintiff or Defendant chosen for the list of cases for the bellwether plan does not waive all venue issues so that all cases so chosen can be tried, if reached, under the plan in this district, then the bellwether plan will be withdrawn and the parties will be without this valuable resource in attempting to determine the many issues with which bellwether trials would be able to assist the parties.  <u>To clarify, if one Plaintiff out of all the Plaintiffs chosen does not waive venue objections to have her case tried in the Southern District of Illinois, her case won't simply be replaced with another, but the bellwether plan will be withdrawn by the Court.  The reason is quite simple, the Plaintiffs in the course of arguing, both orally and in writing, of the importance to the success of the bellwether plan and the randomization of the selection process to keep one side or the other from having the right to veto a case's selection by virtue of playing the venue objection card.  The Court was able</u>

<u>to confirm that position in its independent research. Now, surprisingly, after taking such a strong position, it is the plaintiff's who are threatening the Court with the "Lexecon card" not the Defendants. The Court hopes that all Plaintiffs understand the important nature of a good bellwether plan and the need to proceed with it. An aggressive trial schedule will be pursued by the Court, whether the parties participate in the selection process in order to make sure it has a true bellwether character, or whether the Court selects the cases, thereby losing the ability to select true mill run cases. Parties will then be left with gleaning what they can from the cases selected.</u>

## II.   BACKGROUND

3.   As heretofore established, the most critical element of this plan and the purpose it seeks to serve is for the most representative cases to be selected and for no one to lose sight of that objective. The Plaintiff's Steering Committee has a role to competently represent, at the very least administratively, all of the plaintiffs in this litigation. Defendant's leadership committee must competently represent the defendants. Together, however, they share a common interest in this phase of the litigation, which is to put together a list of cases that most accurately represent the typical case at issue in this litigation. Successful fact gathering during the bellwether process could well lead to an earlier conclusion to this litigation rather than a protracted litigation process, thereby conserving precious resources, redirecting resources, shaping expectations and

serving the ends of justice for all concerned. Little credibility will be attached to this process, and it will be a waste of everyone's time and resources, if cases are selected which do not accurately reflect the run-of-the-mill case. If the very best case is selected, the defense will not base any settlement value on it as an outlier. If a case is picked that is dismissed on summary judgment, after the Plaintiff's evidence or a jury's verdict when it is obviously a weak case, the plaintiffs side will look upon it as an outlier as well.

4.  Likewise, the Court will not take a chance with random selection despite its endorsement by the Complex Litigation Manual. **See Manual for Complex Litigation (Fourth) § 22.315 (2004)**. Most modern plans seem to disfavor random selection in order to have better control over the representative characteristics of the cases selected. **See Fallon, Grabill & Wynne,** *supra*, **at 2349-2351** (discussing various methods for populating the pool of potential bellwether cases). **See e.g., Id. at n. 95** (discussing the bellwether selection process in the Guidant Defibrillators Products Liability Litigation (allowing each party to select an equal number of cases to populate the pool) and noting the court's preference for party input in selecting representative cases).[2] The Court

---

[2] The Court also notes that some courts that have employed random selection have expressed dissatisfaction with the results. **See e.g., Nov. 10, 2009 New Jersey Seroquel Hearing Transcript at 43:2-43:3** (the district court, reflecting on the pool of cases available for bellwether trials (which had been selected at random) stated: "I can tell you that in looking at the remaining three cases, none of them would be my pick for a bellwether; that would be for sure. They each have some wrinkle in them that doesn't make them the ideal bellwether, but this

finds that the process that will provide the best sampling of cases will be one that allows both sides of this litigation to have a role in selecting cases, along with a veto process in the later stages of the litigation, in case advocacy has trumped altruism and both sides have decided to ignore my efforts at objectivity.

### III.   SELECTION PROCESS

5.   The pool of cases, with which discovery will be pursued, from which the bellwether trials will be drawn will consist of ~~fifty (50)~~ <u>twenty-four (24)</u> cases. <u>This reduction in the number of cases should adequately address the Plaintiffs concerns regarding the ability to get the cases ready for trial.  The Court does not accept the assertion from Plaintiffs that the only way to insure a list of cases that can be ready for trial is to let them control the list.  Assuring true representative cases for a bellwether plan requires bipartisan input.</u>  ~~Twenty-five (25)~~   <u>Twelve (12)</u> Plaintiffs[3] will be selected by each side, the PSC and ~~Bayer~~ Defendants.

---

is what we have.  These are the three cases we have.") (Attached hereto as Exhibit A).

[3] For purposes of this Order, the term "Plaintiff" shall refer to an individual who took YAZ®, Yasmin® and/or Ocella® and allegedly suffered a personal injury (a "primary Plaintiff"). The claims of derivative Plaintiffs (such as spouses asserting a loss of consortium claim) shall be subject to discovery and trial pursuant to this Order if the primary Plaintiff from whom such Plaintiffs' claims derive is selected for discovery and/or trial. Further, Plaintiffs who filed complaints containing multiple primary Plaintiffs must be selected (if at all) individually. The claims of any primary Plaintiffs in multi-Plaintiff complaints are hereby automatically

Counsel discussed at length the nature of the alleged injuries pled in the complaints on file. While stroke and heart attack cases make up nine to ten percent of the cases, the parties have agreed not to include that group in the bellwether trials, in part, because those numbers pale in comparison to the other alleged ailments. Venus thromboembolisms (VTE) (which include pulmonary embolisms and deep vein thromboses) make up forty to forty-one percent; while gallbladder injuries account for the remaining forty-three percent of the alleged harms caused by the pharmaceuticals at issue. The Plaintiffs would have the Court put off the gallbladder cases until the end of the bellwether process in a second wave. The Court disagrees with that suggestion. Therefore, when the parties select this pool, equal numbers of venous cases and gallbladder cases should be chosen

6. Other Plaintiffs will also be excluded. Those Plaintiffs whose cases were not filed ~~and served~~ as of the date of this order may not be included by either side on the list of bellwether eligible cases. ~~Any Plaintiff who names as a defendant an entity or individual other than Defendants Bayer Corporation, Bayer Healthcare LLC, Bayer Pharmaceuticals Corporation, Bayer Healthcare~~

---

severed from the claims of other Plaintiffs in the same complaint upon inclusion of the primary Plaintiff in the Discovery Pool.

~~Pharmaceuticals, Inc., Berlex Laboratories, Inc., Berlex, Inc., and/or Bayer Schering Pharma AG shall not be eligible for the list of bellwether cases.~~[4]

7. On October 27, 2010, Plaintiffs' Liaison Counsel and Defendants' Liaison Counsel shall exchange lists of ~~twenty-five~~ twelve plaintiffs names that each choose to be placed on the bellwether list for discovery and potential trial (~~13~~ 8 VTE cases and ~~12~~ 4 gall bladder cases). Moreover, on that same day each counsel shall file with the Court, unsealed, said lists. In the event, duplicate names appear on the list, replacement names shall be filled in the following manner. Utilizing the court assigned case numbers, the lowest (oldest) number shall have the duplicate designation replaced by the PSC, the next duplicate by the ~~Bayer~~ Defendants and so on in alternating turns until all duplicates have been resolved and a full list of fifty cases has been achieved. The parties shall keep a record of this replacement procedure, because it shall be carried over if necessary should any plaintiffs be dismissed for failure to complete her Plaintiff Fact Sheet (PFS) or properly sign her medical authorizations. See paragraph 8.

IV. FACT SHEETS

8. If a plaintiff is identified as eligible pursuant to paragraph 7, but has not yet provided a PFS substantially complete in all respects and/or failed to properly fill out and sign the medical authorizations accompanying the PFS, as

---

[4] This change is intended to allow plaintiffs who have sued any defendant that has been allowed by the case management orders to participate in bellwether trials if representative factually.

provided for by CMO No. 12, by the date of this Order, such discovery shall be due on the earlier of (1) its original due date under CMO No. 12, or (2) twenty-one (21) days after entry of this Order, provided that an Answer has been filed in her case. <u>If an Answer has not yet been filed, one will be filed within 7 days, and the PFS and medical authorization supplied, substantially complete in all respects, within 21 days thereafter.</u> If Plaintiffs do not comply with these deadlines, Defendants shall notify Liaison Counsel of the missing preliminary discovery. If the substantially completed PFS and medical authorizations are not provided within 14 days, the case will be dismissed without prejudice immediately upon the Court's receipt of Defendant's motion. The case will promptly be replaced on the bellwether list in accordance with the procedure set out in paragraph 7 above.

<u>It is the intent of the Court that all efforts be made to pick representative cases regardless of the initial state of preliminary pleadings and discovery. All efforts should be made to correct any preliminary pleading or discovery deficiencies immediately upon that case being selected.</u>

9. Bayer shall provide a Defendant Fact Sheet (DFS), if one has not already been provided, in all eligible plaintiffs cases, where PFS and authorizations have been appropriately provided, on the earlier of (1) its original due date under CMO No. 18, or (2) twenty-one (21) days after the Plaintiff's production of a PFS and authorization pursuant to paragraph 8. Failure to comply will result in the imposition of any sanction available to the Court in the exercise of its inherent power.

## V.   CASE-SPECIFIC CORE DISCOVERY

10. Discovery in any case included in the bellwether discovery pool shall commence following the exchange of party selections on November 1, 2010.

11. In connection with any individual plaintiff's case, the parties may take the depositions of plaintiff's prescribing physician(s), primary treating physician(s), as well as two additional depositions per side. In the event either party seeks discovery beyond these depositions in an individual plaintiff's case, agreement, in writing, between Liaison Counsel must be obtained or, if no agreement can be obtained after a good faith attempt, leave of Court must be obtained upon a showing of good cause.

12. Core case-specific discovery shall be completed no later than March 14, 2011.

## VI.   TRIAL SELECTION

13. The first trial is set September 12, 2011. This will be a pulmonary embolism (PE) case.

14. The second trial is set January 9, 2012. This will be a gallbladder (GB) case.

15. The third trial is set April 2, 2012. This will be an additional thromboembolic (VTE) case.

16. The selection process for each trial will be as follows. The Liaison Counsel, together with any lead counsel he wishes to have present, shall meet and confer for the purpose of accomplishing this task. ~~Eight~~ Four cases of each type designated: ~~eight~~ four PE, ~~eight~~ four GB and ~~eight~~ four VTE will be selected for the trial pool by each party submitting ~~four~~ two plaintiffs names each in each category. Thereafter, each party shall have veto privileges ~~to one of the four cases in each category submitted by the opposing party~~ as follows: <u>Each party shall have the right to exercise two vetoes; one to be exercised in a VTE case (either in one of the PE cases in the first trial group or one of the general VTE cases in the third trial group) and one in a gallbladder case</u>. The result will ~~be six cases in each category, three selected by each party~~ <u>vary in its application. For example, depending on how the vetoes are exercised there could be either six or seven cases remaining in the PE trial group and the same for the VTE trial group. However, there will be six remaining in the gallbladder trial group.</u> Those names shall be submitted to the Court without any indication which party submitted what name. Upon receiving those names the court will select one case in each category to be the first case to be tried and two cases to be backups in case the first case cannot be tried for some reason. <u>The Court will allow the parties to determine when to make this trial selection based on the discovery process and when they feel they are best able to make an informed decision regarding this issue of bellwether selection.</u>

VII.   DISCOVERY COMPLETION

17.   Once a trial pool has been selected further discovery can be conducted in each of the six cases as needed to completely prepare the cases for trial.  For the PE case, to be tried in September, that discovery shall be completed by April 20, 2011.

Further deadlines shall be:

a.   May 2, 2011:  Deadline for Plaintiff to serve Rule 26(a) case-specific expert disclosures and reports.

b.   June 2, 2011:  Deadline for Defendants to serve Rule 26(a) case-specific expert disclosures and reports.

c.   June 22, 2011:  Deadline for Plaintiff to serve any case-specific rebuttal reports under Rule 26(a).

d.   July 20, 2011:  Depositions of all case-specific experts shall be completed.  No depositions of any of Plaintiff's experts shall be conducted until after the Defendants' expert reports have been served in accordance with 17(b) above.

18.   For the GB case, to be tried in January, discovery shall be completed by September 2, 2011.

Further deadlines shall be:

a.   September 16, 2011:  Deadline for Plaintiff to serve Rule 26(a) case-specific expert disclosures and reports.

b.   October 18, 2011: Deadline for Defendants to serve Rule 26(a)

    case-specific expert disclosures and reports.

  c. November 7, 2011:  Deadline for Plaintiff to serve any case-specific rebuttal reports under Rule 26(a).

  d. November 16, 2011:  Depositions of all case-specific experts shall be completed.  No depositions of any of Plaintiff's experts shall be conducted until after the Defendants' expert reports have been served in accordance with 18(b) above.

19. For the VTE case, to be tried in April, discovery shall be completed by November 28, 2011.

  Further deadlines shall be:

  a. December 9, 2011:  Deadline for Plaintiff to serve Rule 26(a) case-specific expert disclosures and reports.

  b. January 10, 2012:  Deadline for Defendants to serve Rule 26(a) case-specific expert disclosures and reports.

  c. January 30, 2012:  Deadline for Plaintiff to serve any case-specific rebuttal reports under Rule 26(a).

  d. February 8, 2012:  Depositions of all case-specific experts shall be completed.  No depositions of any of Plaintiff's experts shall be conducted until after the Defendants' experts reports have been served in accordance with 19(b) above.

20. Plaintiffs suggested in their documentation that treating physicians are not subject to expert reporting under Rule 26(a)(2).   The Defendants did not

take a position. The Court refers the parties to ***Meyers v. National R.R. Passenger Corp. (Amtrak)***, **No. 09-3323, 2010 WL 3385182 (7th Cir. Aug. 30, 2010)**. The ***Meyers*** court held, at page *5 that "a treating physician who is offered to provide expert testimony as the cause of the plaintiff's injury, but who did not make that determination in the course of providing treatment, should be deemed to be one 'retained or specially employed to provide expert testimony in the case,' and is required to submit an expert report in accordance with Rule 26(a)(2)."

## VIII.   CONCLUSION

21.    Having found that this litigation will benefit from the establishment of bellwether trials, the Court has set firm trial dates and means and method for selecting the cases for trials. Likewise, the Court has set discovery deadlines, which are summarized below:

- **Core case-specific discovery deadline: March 14, 2011**
- **Additional deadlines:**

|  | **Pulmonary Embolism (PE) Case** | **Gallbladder (GB) Case** | **Thromboembolic (VTE) Case** |
|---|---|---|---|
| Discovery completed | April 20, 2011 | September 2, 2011 | November 28, 2011 |
| Deadline for Plaintiff to serve Rule 26(a) case-specific expert disclosures and reports | May 2, 2011 | September 16, 2011 | December 9, 2011 |
| Deadline for Defendants to serve Rule 26(a) case-specific expert disclosures and reports | June 2, 2011 | October 18, 2011 | January 10, 2012 |
| Deadline for Plaintiff to serve any case-specific rebuttal reports under Rule 26(a) | June 22 2011 | November 7, 2011 | January 30, 2012 |
| Completion of depositions of all case-specific experts | July 20, 2011 | November 16, 2011 | February 8, 2012 |
| **Trial Date** | September 12, 2011 | January 9, 2012 | April 2, 2012 |

**SO ORDERED:**

/s/   *David R Herndon*

Chief Judge
United States District Court         DATE: October 13, 2010