UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| IN RE: YASMIN AND YAZ (DROSPIRENONE) MARKETING, SALES PRACTICES AND PRODUCTS LIABILITY LITIGATION ) ) ) ) ) | 3:09-md-02100-DRH-PMF<br><br>MDL No. 2100 |

This Document Relates to:

ALL CASES

CASE MANAGEMENT ORDER NUMBER 52

Regarding Motion to Exclude Testimony of Robert Johnson
(MDL 2100 Doc. 2022)

I.  INTRODUCTION

Defendants Bayer HealthCare Pharmaceuticals Inc. and Bayer Pharma AG (Bayer) move to exclude the testimony of plaintiffs' expert Robert W. Johnson (Doc. 2022). Bayer argues Johnson's report is inadmissible as its inclusion violates the Constitution. Further, Bayer argues it fails to meet the requirements for admissibility under Fed. R. Evid. 702 and *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579 (1993)). The Court presumes familiarity with the underlying proceedings. For the following reasons, the Court **DENIES** Bayer's motion (Doc. 2022).

## II. BACKGROUND

This multidistrict litigation (MDL) relates to the manufacture, marketing, and sale of the prescription pharmaceuticals known as YAZ and Yasmin.[1] YAZ and Yasmin, which are manufactured, marketed, and sold by Bayer, are members of a class of prescription medicines known as combined hormonal oral contraceptives (COCs), which contain an estrogen and a progestin component (Doc. 2090, p. 6). The vast majority of COC's, including YAZ and Yasmin, contain the same type of estrogen – ethinyl estradiol (EE) (Doc. 2090, p. 6).[2] In contrast to estrogen, the progestins in COCs are of many types. The progestin in YAZ and Yasmin is a newer type of progestin known as drospirenone (DRSP) (Doc. 2090, p. 6).

DRSP-containing COCs are known as "fourth-generation" COCs (classified by the type of progestin used) (Doc. 2090, pp. 6-5). COCs containing earlier developed progestins are categorized as "first-generation," "second-generation," and "third-generation" (Doc. 2090, p. 6). First-generation COCs contain the progestin norethynodrel (Doc. 2090, p. 6) Second-generation COCs contain the progestin Levonorgestrel (LNG) and third-generation COCs contain several progestins, including desogestrel, gestodene, and norgestimate (Doc. 2090, p. 6).

---

[1] This MDL relates to other oral contraceptives that, like YAZ and Yasmin, contain drospirenone. However, YAZ and Yasmin are the subject drugs involved in the pending bellwether trials.

[2] YAZ and Yasmin differ in their dosing schedule and the amount of estrogen they contain. The Food and Drug Administration (FDA) approved YAZ and Yasmin as oral contraceptives in 2006. The FDA subsequently approved YAZ and Yasmin as a treatment for moderate acne vulgaris in women who choose to use an oral contraceptive and as a treatment for premenstrual dysphoric disorder (PMDD) in women who choose to use an oral contraceptive.

It is generally accepted that there is an increased risk of venous thromboembolic (VTE) disease (disease relating to blood clotting in the veins) in COC users (Doc. 2102-14, p. 5; Doc. 2090-2, p. 2). It is also generally accepted that second-generation COCs (LNG-containing COCs) are considered to have a low risk for VTE disease (Doc. 2102-14 p. 6). Because the VTE risk associated with second-generation COCs is relatively low, LNG-containing COCs are often selected as a reference treatment in comparative studies evaluating whether there is an association between third-generation COCs and an increased risk of VTE disease (*See e.g.,* Doc. 2102-4) and in comparative studies evaluating whether there is an association between DRSP-containing COCs and an increased risk of VTE disease (*See e.g.,* Doc. 2102-14 pp. 5-6). In the mid-1990s, various reports indicated that users of third-generation COCs were at higher risk of VTE disease than users of second-generation COCs (Doc. 2090-2, p. 2).

At issue in this litigation, is the safety of DRSP-containing COCs and whether DRSP use is associated with a higher risk of VTE disease. Specifically, Plaintiffs contend that Bayer misrepresented or omitted facts pertaining to the safety and efficacy of YAZ and Yasmin. With regard to the safety of YAZ and Yasmin, plaintiffs contend that the DRSP component of the drugs is associated with an increased risk of VTE disease and of potentially life threatening thrombosis complications, including deep vein thrombosis (DVT) (a blood clot formation in one of the body's deep veins) and pulmonary embolism (a clot formation that travels to the lungs). Instantly, Bayer seeks exclusion of the

opinion of an economist tasked to frame, in economic terms, the financial condition of Bayer in assessment of its ability to pay punitive damages (Doc. 2022-3, p. 2). Bayer argues plaintiffs tender him to present testimony in violation of the Constitution as it encompasses Bayer's total sales. Further, it argues plaintiffs impermissibly offer Johnson to opine as to Bayer's wealth with the intent to inflame the jury. Lastly, Bayer argues Johnson's report is inadmissible under Fed. R. Evid. 702 and *Daubert*, as it will not assist the trier of fact in its analysis of any issue relevant to the dispute. The Court, having carefully reviewed the record, is satisfied plaintiffs have carried their burden of demonstrating that the challenged witness's purported testimony is constitutional and that it is sufficiently helpful to the trier of fact to hold it admissible under *Daubert*.

### III. Argument and Analysis

#### a. Johnson's Testimony is Admissible Under Relevant State Law and is not Inadmissible as a Matter of Constitutional Law

##### i. Arguments

Bayer first argues Johnson's testimony of Bayer's total wealth is inadmissible under *State Farm Mut. Auto. Ins. Co. v. Campbell,* 538 U.S. 408 (2003), and *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559 (1996), as it encompasses Bayer's total sales. Bayer argues these cases hold Johnson's testimony inadmissible as he impermissibly opines as to conduct unrelated to the specific states in which a particular plaintiff's claim arose (Doc. 2022, p. 6). Further, Bayer contends, as Johnson's testimony is not limited to the analysis of YAZ or

Yasmin related sales, it is unconstitutional as evidence on punitive damages requires demonstration of a sufficient link between the defendant's conduct and the plaintiff's harm (Doc. 2022, pp. 7-8). Lastly, Bayer contends evidence of its corporate wealth is inadmissible as its only purpose "is to inspire the jury to punish Bayer because some Bayer companies are large multinational corporations" (Doc. 2022, p. 9); (*See* Doc. 2132, Bayer's Reply).

Plaintiffs respond that use of Bayer's total income on the issue of punitive damages is proper and admissible under the laws of Illinois, Indiana, Ohio, Iowa, and Minnesota, the relevant law of the bellwether plaintiffs at issue (Doc. 2092, p. 11). Moreover, plaintiffs contend evidence of Bayer's total wealth does not violate the Due Process Clause. Plaintiffs argue Bayer's financial condition concerns the effectiveness of a particular punitive damages award, as opposed to a determination of the reprehensibility of Bayer's conduct (Doc. 2092, pp. 17-18). Accordingly, although Johnson's analysis is unrelated to YAZ and Yasmin sales, it is permissible as the evidence is irrelevant to the reprehensibility of Bayer's conduct; it is only relevant to calibrating the effect of the punitive damages award (Doc. 2092, pp. 19-20). Further, as the Court can ensure the jury does not use evidence of Bayer's wealth for an improper purpose, plaintiffs contend it is relevant and constitutionally permissible (Doc. 2092, p. 19).

### ii. Legal Standard and Application

#### 1. Total Wealth Permissible and Relevant Under Applicable State Law

As an initial matter, plaintiffs contend that use of Bayer's total income, not solely its income generated from YAZ and Yasmin sales, is proper and admissible under the relevant law at issue. Specifically, the state law applicable to all four bellwether plaintiffs: Illinois, Indiana, Ohio, Iowa, and Minnesota. The Court, as a threshold inquiry, finds plaintiffs correct.[3]

The applicable state law of the plaintiff at issue governs the admissibility of Bayer's wealth pertaining to the issue of punitive damages. *See Republic Tobacco Co. v. N. Atl. Trading Co., Inc.,* 381 F.3d 717, 735 (7th Cir. 2004) (stating, "[i]n a diversity proceeding, state law governs the factors a jury may consider in determining the amount of punitive damages, while federal law governs the district court's review of the award and appellate review of the district court's decision"). The laws of five states govern the four bellwether plaintiffs: Illinois (*Sims*), Indiana (*Laforet-Neer*), Ohio (*Bradish*), and either Iowa or Minnesota (*Fender*).[4]

---

[3] The Court notes this Order reflects the majority view. To the extent this Order conflicts with the governing laws of a transferor district; i.e. a transferor district following the minority view, the Court notes the minority law will govern the specific proceedings.

[4] *Fender* was filed in Iowa. However, as plaintiffs note, Bayer contends that under Iowa choice-of-law rules, Minnesota law governs. However, the Court notes the result is the same in this instance under either Minnesota or Iowa law.

### a. Illinois

Under Illinois state law, a reviewing court will only reverse a punitive damages award that is, "so excessive as to demonstrate passion, partiality, or corruption on the part of the decision-maker." *Dubey v. Public Storage, Inc.*, 918 N.E.2d 265, 281 (Ill. App. Ct. 2009) (quoting *Franz v. Calaco Development Corp.*, 818 N.E.2d 357, 367 (2004)). In assessing the gross excessiveness of an award, Illinois courts look to fact-specific circumstances including: "(1) the nature and enormity of the wrong, (2) *the financial status of the defendant*, and (3) the potential liability of the defendant." *Id.* (emphasis added). Concerning the financial status of the defendant, Illinois courts note, it "is important and relevant because an amount sufficient to punish one individual may be trivial to another." *Id.* Thus, the financial status of the defendant is relevant to determination of punitive damages under Illinois state law, as "[t]he amount of the award 'should send a message loud enough to be heard but not so loud as to deafen the listener.'" *Id.* (quoting *Hazelwood v. Illinois Central Gulf R.R.*, 450 N.E.2d 1199, 1207 (1983)).

### b. Indiana

Indiana courts similarly find evidence of a defendant's wealth relevant and admissible as to the determination of punitive damages. *See Stroud v. Lints*, 790 N.E.2d 440, 446 (Ind. 2003). As the Indiana Supreme Court has explained, "[c]urrent law recognizes that punitive damages may serve the societal objective of deterring similar conduct by the defendant or others by way of example. For that

reason, if punitive damages are appropriate, the wealth of the defendant has for many years been held relevant to a determination of the appropriate amount." *Id.* at 445.

### c. Ohio

Further, Ohio courts similarly find consideration of a defendant's wealth a permissible consideration in the determination of punitive damages, as "a punitive damages award is more about defendant's behavior than the plaintiff's loss." *Dardinger v. Anthem Blue Cross & Shield*, 781 N.E.2d 121, 144 (Ohio 2002). However, while permissible and relevant, Ohio courts have noted, "the trier of fact is not required to consider [evidence of defendant's wealth] before awarding punitive damages to a prevailing party." *Doe v. White*, 647 N.E.2d 198, 204 (Ohio App. 1994). Nonetheless, evidence of a defendant's wealth is clearly relevant and admissible under Ohio law.

### d. Iowa

Iowa courts also allow consideration of a defendant's wealth as to the determination of punitive damages. *See Midwest Home Distrib., Inc. v. Domco Indus. Ltd.,* 585 N.W.2d 735, 743 (Iowa 1998) (stating, when reviewing a punitive damages award for excessiveness, the court considers, in addition to other case-specific factors, the "financial condition of the defendant").

### e. Minnesota

Lastly, Minnesota courts also find that, "a defendant's financial condition is only one of many factors to consider when 'measuring' an award of punitive

damages." *Nugent v. Kerr*, 543 N.W.2d 688, 691 (Minn. App. 1996) (citing MINN. STAT. § 549.20). Thus, Minnesota courts hold, "evidence of a defendant's financial condition is an essential element to a plaintiff's punitive damages claim." *Id.* at 692.

Thus, under the applicable state law of the plaintiffs currently in issue, evidence of a defendant's wealth is relevant and admissible. Further, as defendant's wealth is clearly admissible as to the determination of punitive damages, the Court finds Johnson's analysis will assist the trier of fact. Accordingly, contrary to Bayer's assertion that plaintiffs seek Johnson's testimony as to Bayer's wealth only to inflame the jury, the Court holds the disputed testimony relevant and admissible under the applicable state laws of the bellwether plaintiffs.

### 2. Total Wealth Constitutionally Permissible as it Relates to the Effect of the Award

In addition to the Court's determination that evidence of Bayer's wealth is relevant and admissible pursuant to the applicable state law, the Court must also address Bayer's assertion that the inclusion of evidence of Bayer's total wealth, not merely its wealth related to the sale of YAZ and Yasmin, violates the Due Process Clause of the Constitution. As an initial matter, plaintiffs concede Johnson's report analyzes Bayer's total wealth. It is not limited to specific in-state sales in relation to a certain plaintiff, nor is it limited to YAZ or Yasmin related sales (*See* Doc. 2092, p. 11). However, the Court will not permit plaintiffs to

present evidence of Bayer's aggregate conduct in any individual case. Stated another way, evidence of Bayer's total wealth is only relevant to the amount of punitive damages the trier of fact awards in each case. Thus, evidence of Bayer's total wealth, as it relates to each individual plaintiff's case, is admissible.

As it pertains to the Due Process Clause, the Supreme Court has explained that only "grossly excessive" punitive damages awards violate the Constitution. *See State Farm Mut. Auto. Ins. Co.*, 538 U.S. at 416; *see also Gore*, 517 U.S. at 562. In *Gore*, the Supreme Court provided three "guideposts" pertaining to the determination of a punitive damages award's status as "grossly excessive;" namely, (1) "the degree of reprehensibility of the defendant's conduct;" (2) "the ratio [of the punitive damage award] to the actual harm inflicted on the plaintiff;" and (3) the "civil or criminal penalties that could be imposed for comparable misconduct." *Gore,* 517 U.S. at 575-83.

Further, in *State Farm*, the Supreme Court clarified that, "as a general rule," a State does not "have a legitimate concern in imposing punitive damages to punish a defendant for unlawful acts committed outside of the State's jurisdiction." *State Farm Mut. Auto. Ins. Co.*, 538 U.S. at 421. Notably, however, the Supreme Court has also clarified that a defendant's wealth is a relevant and admissible factor in determining the amount of a punitive damages award. *See Gore*, 517 U.S. at 591 (Breyer, J., concurring) (stating, the financial position of the defendant "provides an open-ended basis for inflating awards when the defendant is wealthy . . . [t]hat does not make its use unlawful or inappropriate; it

simply means that this factor cannot make up for the failure of other factors, such as 'reprehensibility,' to constrain significantly an award that purports to punish a defendant's conduct"). Thus, as it pertains to reprehensibility of a defendant's conduct, a jury may not consider evidence of a defendant's nationwide conduct to impose a larger award of punitive damages. *State Farm Mut. Auto. Ins. Co.,* 538 U.S. at 419-20.

However, as noted previously, the reprehensibility of the defendant's conduct and the defendant's wealth are separate inquiries. *See Dubey*, 918 N.E.2d at 281 (stating factors majority of states consider in determining amount of punitive damages). To clarify, the Court will only allow the jury to consider Bayer's total wealth as it pertains to the individual plaintiff at-issue. Thus, Bayer's total wealth is solely relevant to a punitive damages award's effect, not to Bayer's reprehensibility. Accordingly, as the Court will not allow plaintiffs to present evidence of Bayer's total wealth as evidence of additional conduct in need of punishment, its inclusion does not violate the Due Process Clause.

### b. **Johnson's Opinion is Admissible Under *Daubert***

#### i. **Arguments**

Bayer contends Johnson's report is inadmissible under *Daubert*, as it encompasses matters of general knowledge that the jury does not require expert testimony to understand (Doc. 2022, p. 10). As he does not testify to something more than what is "obvious to a layperson," Bayer alleges *Daubert* holds his report inadmissible (Doc. 2022, p. 12).

Plaintiffs respond Johnson bases his report of Bayer's total income on a variety of public documents, currency exchange rates, and Bayer internal documents (Doc. 2092, p. 20). Thus, Johnson's summary report is the proper subject of expert testimony, as financial expertise is required to inform the jury of Bayer's corporate wealth and financial status (Doc. 2092, p. 21).

### ii. Legal Standard and Application

#### 1. Legal Standard

FEDERAL RULE OF EVIDENCE 702, and *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993), govern the admissibility of expert testimony. The *Daubert* standard applies to all expert testimony, whether based on scientific competence or other specialized or technical expertise. *Smith v. Ford Motor Co.*, 215 F.3d 713, 719 (7th Cir. 2000) (citing *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S.137, 141 (1999)). Rule 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702. *Daubert* clarified Rule 702 charges the district court with the task of ensuring expert testimony is both relevant and reliable. *Daubert*, 509 U.S. at 589.

Courts in the Seventh Circuit conduct a three-step analysis under *Daubert*. *Ervin v. Johnson & Johnson, Inc.,* 492 F.3d 901, 904 (7th Cir. 2007).[5] First, the district court must determine whether the person whose testimony is offered is in fact an expert, as codified in Rule 702 through "knowledge, skill, experience, training, or education." *Id.* (citing Fed. R. Evid. 702). Notably, although "extensive academic and practical expertise" sufficiently qualify a potential witness as an expert, *Bryant v. City of Chicago,* 200 F.3d 1092, 1098 (7th Cir. 2000), "Rule 702 specifically contemplates the admission of testimony by experts whose knowledge is based on experience," *Walker v. Soo Line R.R. Co.*, 208 F.3d 581, 591 (7th Cir. 2000). *Smith*, 215 F.3d at 718 (citing *Kumho*, 526 U.S. at 156 ("[N]o one denies that an expert might draw a conclusion from a set of observations based on extensive and specialized experience.")).

Secondly, the district court must determine the expert's reasoning or methodology is reliable. *Ervin,* 492 F.3d at 904; *see Mihailovich v. Laatsch*, 359 F.3d 892, 918 (7th Cir. 2004) (citing *Kumho*, 526 U.S. at 147). Specifically, the testimony must have a reliable basis in the knowledge and experience of the relevant discipline, *Kumho*, 526 U.S. at 149 (internal quotations removed), consisting in more than subjective belief or unsupported speculation. *Chapman v. Maytag Corp.*, 297 F.3d 682, 687 (7th Cir. 2002); *Daubert*, 509 U.S. at 590.

---

[5] The Court notes the Seventh Circuit has also described the *Daubert* analysis as a two-step process. *See Chapman v. Maytag Corp., 297 F.3d 682, 686 (7th Cir. 2002)*. However, as *Chapman* simply combines the first two steps described in *Ervin* as a single test of reliability, whether the analysis is described as a three-step or two-step process does not substantively change the Court's analysis.

Further, as to reliability, *Daubert* provided the following non-exhaustive list of relevant factors: "(1) whether the scientific theory can be or has been tested; (2) whether the theory has been subjected to peer review and publication; (3) whether the theory has been generally accepted in the scientific community." *Ervin*, 492 F.3d 901, 904 (7th Cir. 2007) (citing *Daubert*, 509 U.S. at 593-94). However, there is no requirement that courts rely on each factor, as the gatekeeping inquiry is flexible and must be "tied to the facts" of the particular case. *Kumho*, 526 U.S. at 150 (quoting *Daubert*, 509 U.S. at 591); *see also Chapman*, 297 F.3d at 687. Thus, "the role of the court is to determine whether the expert is qualified in the relevant field and to examine the methodology the expert has used in reaching his [or her] conclusions." *Smith*, 215 F.3d at 718 (citing *Kumho,* 526 U.S. at 153).

The district court possesses "great latitude in determining not only *how* to measure the reliability of the proposed expert testimony but also whether the testimony is, in fact, reliable." *United States v. Pansier*, 576 F.3d 726, 737 (7th Cir. 2009) (citing *Jenkins v. Bartlett*, 487 F.3d 482, 489 (7th Cir. 2007)). Accordingly, the court's gatekeeping function requires focus on the expert's methodology; "[s]oundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions based on that analysis are factual matters to be determined by the trier of fact." *Smith*, 215 F.3d at 718 (citing *Daubert*, 509 U.S. at 595; *Walker,* 208 F.3d at 587).

Resolution of an expert's credibility or the correctness of his or her theories is left to the jury's determination after opposing counsel has cross-examined the

expert at issue. *Id.* (citing *Walker*, 208 F.3d at 589-90). Thus, "[i]t is not the trial court's role to decide whether an expert's opinion is correct. The trial court is limited to determining whether expert testimony is pertinent to an issue in the case and whether the methodology underlying that testimony is sound." *Id.* (citing *Kumho*, 526 U.S. at 159 (Scalia, J., concurring) (stating that the trial court's function under *Daubert* is to exercise its discretion "to choose among reasonable means of excluding expertise that is fausse and science that is junky")). However, as an expert must explain the methodologies and principles that support his or her opinion, he or she cannot simply assert a "bottom line" or *ipse dixit* conclusion. *Metavante Corp. v. Emigrant Sav. Bank*, 619 F.3d 748, 761 (7th Cir. 2010) (quoting *Minix v. Canarecci*, 597 F.3d 824, 835 (7th Cir. 2010)).

Lastly, the district court must consider whether the proposed testimony will assist the trier of fact in its analysis of any issue relevant to the dispute. *See Smith*, 215 F.3d at 718; *Chapman*, 297 F.3d at 687; *Daubert*, 509 U.S. at 592. It is crucial that the expert "testify to something more than what is 'obvious to the layperson' in order to be of any particular assistance to the jury.'" *Dhillon v. Crown Controls Corp.,* 269 F.3d 865, 871 (7th Cir. 2001) (quoting *Ancho v. Pentek Corp.,* 157 F.3d 512, 519 (7th Cir. 1998)). However, the expert need not have an opinion as to the ultimate issue requiring resolution to satisfy this condition. *Smith,* 215 F.3d at 718 (citing *Walker*, 208 F.3d at 587).

### 2. Johnson's Opinion is Helpful to the Trier of Fact

As Bayer only disputes the helpfulness of Johnson's testimony to the trier of fact, the Court presumes Johnson's status as qualified to opine in the given manner,[6] and the reliability of the methodology underlying Johnson's findings.[7] Thus, the Court limits its analysis to the third prong of the relevant analysis under Fed. R. Evid. 702 and *Daubert*, whether Johnson's opinion will assist the trier of fact in its analysis of any issue relevant to the dispute. As Johnson's report opines as to something more than what is "obvious to the layperson," the Court finds it is admissible under Fed. R. Evid. 702 and *Daubert*.

Plaintiffs offer Johnson to "frame, in economic terms, the financial condition of [Bayer]" (Doc. 2022-3, p. 2). Johnson states, "[t]he financial condition encompasses the areas of financial health, wealth and economic status" (Doc. 2022-3, p. 2). In forming his opinion as to Bayer's total wealth, plaintiffs contend he consulted various public documents, made the appropriate currency conversions, and then aggregated the numbers. This task, plaintiffs further argue, is outside an average juror's ability (Doc. 2092, p. 20). The Court agrees.

---

[6] The Court cites to Johnson's curriculum vitae as the basis of this assertion (*See* Doc. 2022-3, pp. 28-48) (listing Johnson's credentials as including an MBA from Stanford University, a BA from Baruch College, numerous professional positions as an expert witness pertaining to the analysis of damages, and numerous publications Johnson has authored pertaining to economic damage assessment in litigation).

[7] Johnson reviewed litigation documents related to the instant dispute, Bayer financial statements, Bayer annual reports, market capitalization data, and historical financial statement spreadsheets in preparing his report (*See* Doc. 2022-3, pp. 2-3). Thus, the Court finds Johnson used reliable sources in determining Bayer's total wealth. Further, Johnson states he determined Bayer's net worth by deducting its assets from its liabilities (*See* Doc. 2022-1, pp. 27-28). Thus, as this is the method generally accepted in the economic community, it is reliable. Accordingly, the Court finds Johnson's methodology reliable.

Notably, Fed. R. Evid. 1006 provides:

> The proponent may use a summary, chart, or calculation to prove the contents of voluminous writings, recordings, or photographs that cannot be conveniently examined in court. The proponent must make the originals or duplicates available for examination or copying, or both, by other parties at a reasonable time and place. And the court may order the proponent to produce them in court.

Clearly, it is generally more helpful to the trier of fact and efficient for the Court to present voluminous information in the form of a summary. However, the jury requires someone in possession of the necessary knowledge and expertise to explain the relevant summaries and charts.

Although concededly comprehensible, the Court finds Johnson's report assists the trier of fact in its analysis of issues relevant to the dispute. As explained previously, evidence of Bayer's total wealth is relevant and admissible as it pertains to a possible punitive damages award in each individual plaintiff's case. Accordingly, to allow the jury to assess Bayer's wealth with any level of accuracy, an expert is required to determine Bayer's total wealth and explain his or findings in a manner helpful to the trier of fact. Thus, the Court finds Johnson's report is helpful to the trier of fact as it converts currency forms of various documents and then uses generally-accepted economic formulas to determine Bayer's total wealth; a task not within the general ability of a layperson. Therefore, Johnson's report satisfies the requirements of Fed. R. Evid. 702 and *Dabuert*. As such, it is admissible.

## IV. CONCLUSION

The Court finds, pursuant to the majority rule under state law, evidence of Bayer's total wealth is relevant and admissible as to a possible determination of punitive damages. Further, evidence of Bayer's total wealth, as it pertains to each individual plaintiff's case, is not inadmissible as a matter of constitutional law. Moreover, plaintiffs do not admit evidence of Bayer's total wealth solely to inflame the jury. Lastly, Johnson's expert opinion satisfies the requirements of Fed. R. Evid. 702 and *Daubert*. Accordingly, Bayer's motion to exclude testimony of plaintiffs' expert Robert W. Johnson is **DENIED** (Doc. 2022).

**SO ORDERED**

David R. Herndon
2011.12.16
17:30:29 -06'00'

**Chief Judge**
**United States District Court**                    Date: December 16, 2011